# Supreme Court of Texas

No. 22-0940

Texas Tech University Health Sciences Center–El Paso,

*Petitioner*,

v.

Loretta K. Flores,

*Respondent*

On Petition for Review from the
Court of Appeals for the Eighth District of Texas

JUSTICE BLACKLOCK, joined by Justice Young, concurring.

Thanks in large part to the way judges have interpreted employment-discrimination statutes, a pervasive "human resources" industry long ago attached itself to nearly every aspect of American life outside the home. It enlists us all in its elaborate game of litigation-avoidance, demanding of everyone a diligent and circumspect self-censorship during the considerable percentage of our waking hours we spend at work. Many people, it seems, end up internalizing the politically correct dictates of corporate risk-avoidance culture and thereby mistakenly come to believe that all kinds of interesting things

the HR Department warns us not to talk about are somehow illegal or even immoral. And so this enervating regime of workplace speech-policing spills out of the office, infecting the broader culture.

American industry and American government spend many billions every year on the economically unproductive pursuit of compliance with the labyrinthine dictates of employment law. Judges and bureaucrats, not legislators, built the labyrinth. The economic loss represented by the expenditures required to navigate it pales in comparison to another unwelcome consequence of modern employment law. More difficult to calculate, but no less real, are the economic and social consequences of converting so many American workplaces from lively engines of innovation and competition into sclerotic bureaucracies whose prime directive is to avoid litigation rather than to achieve excellence.

Very little of this could have been envisioned by the legislators who voted for Title VII of the federal Civil Rights Act or Chapter 21 of the Texas Labor Code. Very little of it is compelled by the text of these laws. Those who lament the suffocating and sterile culture of many modern American places of employment can justifiably direct some of their complaints to the judges and to the executive branch regulators. We did much of this, and we should think about how to undo it.

* * *

The two people sitting across from each other in a job interview are flesh-and-blood human beings trying to get to know each other—not performers in a kabuki dance choreographed by the HR Director.

2

Questions will be asked. Someone might even get uncomfortable. Life goes on. Fortunately, this meritless litigation does not.

As the Court observes, the only evidence proffered to show that age discrimination had anything to do with the medical school President's decision not to hire the plaintiff as his Chief of Staff is that he asked the plaintiff how old she was during a job interview. That question surely violated Texas Tech's HR Manual, but it did not violate the law. Nothing we know about the conversation indicates that this perhaps indelicate question was motivated by nefarious discriminatory purposes. Asking someone her age may be a little rude, depending on the circumstances, but it is also a very natural and normal topic of human conversation. It is certainly no evidence of illegal discrimination.

The proverbial HR Manual (does anybody really read these things?) probably warns an interviewer never to ask a job applicant's age. But it does so only because lawsuits like this one are expensive and distracting, not because it is actually illegal or discriminatory to ask the question. It is only illegal, sometimes, to discriminate on the basis of *the answer*—and it is beyond me how anyone could reasonably infer discriminatory intent from the question itself. People ask each other's ages all the time. They also ask each other where they are from (national origin, a protected status). And they ask each other about their families (familial status, another one). There is nothing discriminatory about these questions, and it is not illegal to ask them in a job interview or anywhere else.

\* \* \*

Because the plaintiff lacks evidence of discrimination, she seeks to generate an "inference" of discrimination by showing that the President's innocent explanation—that he simply thought the successful candidate was a better fit for the job—is just a "pretext" for age discrimination against the plaintiff. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973). In *McDonnell Douglas*, the U.S. Supreme Court devised the following three-step framework: A plaintiff who lacks direct evidence of employment discrimination may nevertheless demonstrate it by showing (1) that the plaintiff was qualified for the position but was treated less favorably than someone outside the protected class, which (2) shifts the burden to the defendant to show a legitimate, non-discriminatory reason for its employment decision, which (3) shifts the burden back to the plaintiff to show that the proffered reason for the decision is a "pretext" for discrimination. *Id.* at 802–04. A plaintiff who succeeds at step three has mustered enough evidence of discrimination to survive summary judgment—at least according to this framework. *See id.*

I see no basis for this elaborate formula in the text of the Texas Labor Code.[1] *McDonnell Douglas* dates to a time when courts were often less attentive to statutory text—and more attentive to perceived

---

[1] *See also* "disparate impact" and "hostile work environment" for other examples of highly consequential jurisprudential concepts whose basis in the statutory text does not readily jump off the page.

statutory purpose—than are most courts today, including this Court.[2] It also dates to a time in our history, 1973, when legally sanctioned racial discrimination was still a recent memory. Perhaps, at that time, there was reason to worry that invidious racial discrimination, sometimes difficult to prove with direct evidence, lurked beneath the surface of many employers' innocent explanations. This concern about the hidden, nefarious motives of employers seems to have driven the creation—and elaboration in later cases—of a relaxed evidentiary standard based on "inferences" and "pretexts," which essentially reverses the burden of proof: The plaintiff may show discrimination by showing that the defendant has not convincingly disclaimed discrimination—i.e., that the defendant's innocent explanation is unworthy of credence.

*McDonnell Douglas*'s relaxed evidentiary standard—and the mountains of caselaw and oceans of bureaucratic detritus derived from it—originated with the concern, less than a decade after the end of Jim Crow, that racial discrimination in employment would be both frequent and easy to get away with if plaintiffs were required to prove with direct evidence that the employer's unfavorable decision was made "because of" the plaintiff's race. But what sense does it make to apply caselaw driven by 1970s-era concerns about *race* relations to an *age* discrimination case in 2024? This is not 1973.

---

[2] *Compare McDonnell Douglas*, 411 U.S. at 800–01 (quoting several judicial statements of Title VII's perceived purpose without ever quoting the statutory text), *with In re Tex. Educ. Agency*, 619 S.W.3d 679, 690 (Tex. 2021) (judicial attempt to "advance a presumed but unarticulated statutory purpose . . . runs counter to bedrock statutory construction principles").

We could easily discard all of this and return to the firm foundation of the statutory text.[3]  If the text of the Labor Code directed the courts to act as if hidden employment discrimination is lurking around every corner, then we would be obligated to do so.  The text plainly does not do this.  It just says, "An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer . . . fails or refuses to hire an individual . . . [etc.]"  TEX. LAB. CODE § 21.051(1).  The crucial fact on which liability under this provision turns is the employer's conscious discriminatory motive: Was the adverse decision made "because of" the plaintiff's protected characteristic?  Culpable mental states can be difficult to prove, but difficulty of proof is no excuse for lack of proof.

In 2024, allegations of discrimination can of course be highly damaging to the alleged discriminator, no matter the outcome in court.  More than fifty years after *McDonnell Douglas*, there is a strong case to be made that, in this day and age, using the court system to brand the scarlet label of "discrimination" on your fellow citizen *should be* difficult to do and *should be* subject to a rigorous evidentiary burden.  We do not normally permit parties to prove their cases using suspicion and surmise rather than evidence.  *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).  I see no valid justification in the text of the Texas Labor

---

[3] Texas courts have no obligation at all to look to federal caselaw when applying an analogous Texas statute.  *See Tex. Tech Univ. Health Scis. Ctr.–El Paso v. Niehay*, 671 S.W.3d 929, 946 (Tex. 2023) (Blacklock, J., concurring) ("Federal sources of law have no formal role to play, in this case or in future cases, as this Court seeks to understand whether the various legal obligations that might be imagined to arise from Chapter 21 of the *Texas* Labor Code have truly achieved the consent of the governed in Texas.") (emphasis in original).

Code for the evidentiary burdens in employment-discrimination cases to operate any differently than they do in other cases.

Nevertheless, despite my reservations, this Court has routinely employed the *McDonnell Douglas* burden-shifting analysis when applying Texas law. *See, e.g., Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 640 (Tex. 2012). These parties do not suggest we have any alternative, although future parties are welcome to do so.

\* \* \*

Whether under the *McDonnell Douglas* framework or otherwise, it should not have taken so long for the courts to dispose of this meritless case. But the case's undeserved lifespan is not the only problem here. Courts should be more aware that employment litigation challenging hiring decisions in the government—particularly in higher levels of government employment—threatens to impermissibly entangle the judicial branch in the executive branch's prerogatives.

The President of a public medical school needed to hire a Chief of Staff, an executive-level employee who would serve in a position of trust and responsibility in the leadership of a large government organization. This was the President's decision to make, of course—not a judge's or a jury's. And it was a *personal* decision, not merely a *personnel* decision. An executive leading a large organization, choosing a Chief of Staff who will handle many important matters on his behalf, must choose someone in whom he *personally* has great confidence. No matter what the HR Manual says, an applicant for such a job cannot demonstrate his suitability for the position merely by pointing to his objective qualifications. High-level positions of trust within a large

7

organization—whether in the public or private sector—are not available to just anybody with the credentials and experience listed in the job posting. Instead, a front-office position like Chief of Staff to the President of a university will naturally be reserved for someone in whom the President personally wishes to place his trust.

At no point has the plaintiff mustered any evidence that she was ever such a person.[4] Instead, the record is clear that the President had already identified such a person—the successful applicant—before the official hiring process began. He had worked with the successful applicant in the past, and he recruited her for the Chief of Staff position, convincing her to apply for it rather than leave for another opportunity. The President had also worked briefly with the plaintiff, and during that time he had not gained the kind of confidence in her that he had in the successful applicant. After interviewing both of them, he hired the one he thought was best for the job. Nothing in the record remotely suggests otherwise.

The parties focus considerable attention on whether the plaintiff was objectively qualified for the position described in the job posting.

---

[4] To the contrary, at the time the hiring decision was made, the plaintiff was already suing the medical school in a different employment-discrimination lawsuit, which she lost. *See Tex. Tech Univ. Health Scis. Ctr.–El Paso v. Flores*, 612 S.W.3d 299, 302 (Tex. 2020). Given that acrimonious history, the idea that she would have been hired as the medical school's Chief of Staff but for her age strikes me as fantastical. While there are restrictions on retaliation against employees who sue their employer, it cannot be illegal retaliation to decline to give someone who is suing you a promotion to a high-level position of great trust and responsibility. I struggle to imagine any scenario in which such a person would ever be named Chief of Staff of the very entity she is actively accusing of illegal discrimination.

That is not at all the right question in a case like this. The central question in this appeal ought to be whether this record gives a reasonable fact-finder any basis to conclude that the President subjectively thought, apart from the plaintiff's age, that she would be a good fit for this high-level job in his new administration. If there was evidence he thought *that* and nevertheless refused to hire her because she was too old, the plaintiff might have a claim. Likewise, if there was evidence that the *reason* the President thought the plaintiff was not well suited for the Chief of Staff position was her age, then she might have a claim. But there is no such evidence. There is only evidence that other people—but not the President—thought the plaintiff was highly qualified and deserved the job. Of course, nothing about the President's state of mind can reasonably be inferred from other people's opinions about a decision that was not theirs to make.

The plaintiff emphasizes her history of excellent job performance reviews, none of which were written by the President. Obviously, the fact that the old boss thought highly of an employee is no evidence that the new boss is lying when he says he wasn't as impressed. An objectively qualified candidate's suitability for a position like Chief of Staff of a government organization is ultimately a subjective judgment call that the principal officer must have the freedom to make, no matter what old performance reviews or hand-wringing human resources directors may say. In this case, the President chose as his Chief of Staff the candidate he hand-selected and urged to apply, rather than the candidate who had recently sued the school for age discrimination and with whom he was not particularly impressed. The harder I squint to

try to see the age discrimination lurking somewhere in the background, the more convinced I become that this case is not just meritless but frivolous.

Again, the plaintiff makes much of her glowing performance reviews and her recommendation letters from colleagues. It cannot be the case, however, that a newly appointed government executive has any obligation *at all* to heed his predecessors' opinions about the staff. In fact, when government offices change hands for political reasons, it may often be the case that the old management's high opinion of an employee gives the new management reason to doubt the employee's continued suitability. This was not such a situation. There is no evidence the new President of the medical school had anything but a cordial and productive relationship with the pre-existing staff. But the fact remains that the President was charged by the school's trustees with overseeing the reorganization of Texas Tech's pre-existing El Paso operation into a free-standing medical school and then leading the new school in its crucial first years. An essential aspect of such a high-stakes job is the authority to hire and fire staff, particularly in key front-office positions like Chief of Staff. Subjecting those decisions to judicial review through employment litigation is no small judicial imposition on a coordinate branch of state government.

Judicial review of a private employer's personnel decisions under the *McDonnell Douglas* framework has always been a doubtful enterprise as a matter of statutory interpretation. *See supra* at 4. But when courts apply employment-discrimination statutes in a way that installs judges and juries as minders of the *executive branch's* personnel

10

decisions, the Constitution's separation-of-powers guarantee may have something to say about it. *See* TEX. CONST. art. II, § 1. I do not think the Labor Code or any other statute authorizes courts to engage in judicial review of the executive branch's personnel decisions. Any statute that did so would be constitutionally suspect, to say the least. But judicial review of executive-branch hiring is exactly what many judicial opinions in this area of law look like, as they micro-analyze the competing qualifications of government employees in search for the "inferences" and "pretexts" behind which discrimination may be lurking. *See, e.g., Tex. Tech Univ. Health Scis. Ctr.–El Paso v. Flores*, 657 S.W.3d 502 (Tex. App.—El Paso 2022).

Whatever small sliver of the executive power of the State of Texas was vested in the President of Texas Tech's El Paso medical school, surely that power includes the authority to hire a Chief of Staff without the judiciary looking over his shoulder—and surely it is none of the judiciary's business whether he was "right" or "wrong" about the suitability of the applicants. It might be the judiciary's business if there were actually any genuine evidence of age discrimination, which the Texas Legislature has outlawed. As the Court correctly concludes, there is none.[5]

With these observations noted, I respectfully concur.

---

[5] The record provides abundant reason to believe that the President was justified in concluding the applicant he chose was more qualified for the job. We need not consider any of that evidence, however, because our job is not (or at least should not be) to second-guess his judgment. Our job is to decide whether there is any evidence that age discrimination—rather than the President's genuine belief about which candidate was more suitable— motivated his decision. There is not.

_____
James D. Blacklock
Justice

**OPINION FILED:** December 31, 2024